## 69550. SOUTHERN RAILWAY COMPANY v. MALONE FREIGHT LINES, INC. et al.
### (330 SE2d 371)

BIRDSONG, Presiding Judge.

Subrogation — Rights and Limitations. These appeals arise out of a somewhat complex factual situation. In September 1981, the Purex Corp. purchased 1,300 cases of dry detergent. Purex contracted with Malone Freight Lines to transport the detergent from New York to a suburb of Atlanta. Malone in turn subcontracted with the Rankin brothers to transport the soap in the Rankin's tractor-trailer. Delbert Rankin arrived at the warehouse in Atlanta at about 2:30 a.m. on the morning of September 10, 1981. Rankin was directed to redeliver the trailer load of detergent to another warehouse nearby. Rankin proceeded from the first warehouse toward the second. He was required to drive along an access road. This road ran in a north-south direction parallel to U. S. Highway 41. Between the access road and Route 41 ran the tracks of Southern Railway. The access road paralleled the highway and railroad to the west side.

Rankin drove north to an intersecting road which crossed the access road, the railroad tracks, and ended at a "T" intersection with Route 41. He had to turn right on the intersecting road to cross the railroad tracks and approach the highway. Because of the length of his trailer, Rankin could not make a right turn without jockeying back and forth until the trailer would clear a stop sign at the corner of the intersection of the north-south access road and the east-west intersecting road. According to Rankin, during this turn he had a view of the railroad tracks both north and south and saw no train. After navigating the turn to the right, Rankin drove to about 15 feet of the tracks and stopped. He once again looked up and down the tracks and saw nothing coming.

However, Rankin was aware that the traffic was heavy on Route 41 and a stop sign at Route 41 precluded him from proceeding directly from the intersecting road onto Route 41. Rankin proceeded across the tracks and stopped at the stop sign at Route 41. By this

time because of the sleeper portion of his cab, he could not see the north or south to the rear and sides of the tractor. Approximately 40 feet of the trailer extended over and across the tracks. Before Rankin could pull his tractor-trailer into Route 41, a train operated by an employee of Southern Railway rounded a bend in the tracks approximately 300-400 yards south of where Rankin sat in his tractor. The train was unable to stop in time and cut Rankin's trailer in half, destroying the trailer and effectively destroying the detergent as a deliverable item. Rankin filed a claim for the loss of the trailer with his insurer, Empire Fire & Marine Ins. Co. An evaluation of the trailer (which was only 10 days old at the time of its destruction) placed the value at $11,000. Empire paid Rankin full market value less a $500 deductible and took an assignment of the claim. According to the liability established for interstate carriers, Malone was liable to Purex for Purex' loss of detergent. Malone negotiated the value of the detergent and paid Purex $10,382.41 as the fair value of the loss. Malone salvaged some of the detergent and sold it for $3,500.

Rankin brought suit against Southern for the loss of his trailer. At the motion of Southern that Rankin was not the real party at interest, the trial court dismissed Rankin as the plaintiff and substituted Empire. Malone was allowed to intervene as an essential party. Thus at the time of trial, Southern was defendant in a suit by Empire and Malone both as subrogated plaintiffs. Southern filed a counterclaim against Rankin for damages to its engine allegedly caused by Rankin's negligent blockage of the railway tracks.

In addition to the suits for damages on the value of the trailer and the detergent, Empire incurred costs of $700 for towing away the trailer. Malone incurred additional costs for cleaning up the area and recovering the spilled detergent. Relying on the provisions of OCGA § 46-1-2 (b), Empire sought exemplary damages in addition to compensatory damages. Relying on OCGA § 46-2-90, both Empire and Malone sought attorney fees. The jury returned verdicts against Southern and in favor of Empire and Malone. Empire won verdicts of $11,000 compensatory damages ($500 reserved for Rankin as reimbursement of the deductible), exemplary damages in the amount of $1,004.13, and attorney fees of $5,000. Malone was awarded $7,343 compensatory damages and $5,000 attorney fees. The jury found against Southern on its counterclaim.

Southern brings this appeal enumerating as error that neither Empire nor Malone was entitled to attorney fees; that Empire was not entitled to exemplary damages; and that Malone had not established the value of the detergent by competent, admissible evidence. In essence these enumerations are involved in the giving or failing to give requested charges which highlight the legal issues involved. *Held*:

1. Our resolution of the issues involved in this case must start

with the examination of the statutes giving rise to the causes of action. OCGA § 46-1-2 (c) provides in pertinent part that "(c) Any railroad . . . may be sued by anyone whose . . . property has been injured by such railroad . . . for the purpose of recovering damages for such injuries. . . ." The pertinent part of subsection (b) provides: "(b) In actions against railroad companies for recovery of damages for any wrong or injury inflicted by such companies . . . provided that in cases of willful violation of law, such railroad companies shall be liable for exemplary damages." OCGA § 46-2-90 provides in part: "If any company under the jurisdiction of the commission does . . . any act which is prohibited . . . such company shall be liable to the persons affected thereby for all loss, damage, or injury caused thereby or resulting therefrom. . . . In case of recovery, if the jury finds that such act . . . was willful, it may fix a reasonable attorney's fee. . . ."

It is clear that the combined intent of these two statutes is to provide for the recovery of compensatory and exemplary damages as well as attorney fees for the tortious infliction of property damages upon the owner or possessor of property where the damage is inflicted as the result of a wilful act. See *Lamb v. Howard*, 145 Ga. 847 (90 SE 63); *Poole v. City of Louisville*, 107 Ga. App. 305, 307 (130 SE2d 157). Thus, it is an acceptable premise that both Rankin and Purex who were the "victims" of the alleged tortious negligence of Southern's engineer could have sued for the compensation of their out-of-pocket expenses such as the value of the trailer, the storage of the trailer pending settlement, the loss of the detergent, the cost of cleanup and salvage. All these are expenses directly resulting from the alleged tortious act. But what "property" loss was suffered by Malone and Empire? Empire did not own the trailer nor was it responsible for the towing or storage of the trailer. These were the responsibilities of the actual owner, Rankin. Likewise the damage to the soap, its clean up, and salvage expenses all were the legitimate expenses of its owner, Purex. Empire was responsible for the out-of-pocket expenses concerning solely the loss of Rankin's trailer suffered by Rankin, for Empire only insured the trailer. So far as the record shows, the only out-of-pocket expense suffered by Rankin that was absorbed by Empire was the $11,000 reimbursement for the value of the trailer. Rankin paid no storage costs or attorney fees or other costs of litigation for which reimbursement was due. Likewise Malone as a subrogee to Purex paid Purex only for the value of the detergent. All other expense incurred by Malone was its own expense arising out of its litigation with Southern.

As pointed out by the parties on appeal, there are no Georgia cases directly on point as to the rights of a subrogated plaintiff when suing in his own right for losses suffered by payment of its subrogor.

Empire and Malone argue cogently that subrogation is both a le-

gal and an equitable right. The purpose of subrogation is to substitute one person in the place of another so that the substituted party may exercise the rights of the original creditor. They argue therefore that the substitute is put in all respects in the place of the party to whose rights he is subrogated. See *Liberty Mut. Ins. Co. v. Alsco Constr. Co.*, 144 Ga. App. 307, 308-309 (240 SE2d 899). The argument continues that if there can be no real dispute that Rankin was entitled to pursue a claim for exemplary damages against Southern, then Rankin's subrogee, Empire who inherited Rankin's causes of action likewise was entitled to pursue and recover exemplary damages. That claim did not just disappear. A similar argument is advanced for the recovery of attorney fees by both Empire and Malone.

Opposed to this argument by Malone and Empire, Southern argues that as subrogees Malone and Empire are entitled only to recover those payments made by Malone and Empire as a result of their obligations to repay for losses under the contract of insurance or imposed upon Malone as an interstate carrier.

While apparently there are no Georgia cases applying the two statutes involved to subrogated plaintiffs, there is a federal district court decision which has considered this question. While decisions of foreign (non-state) courts are not binding on this court, they can furnish guidelines that may be instructive and worthy of acceptance. Thus in *Maryland Cas. Co. v. Brown*, 321 FSupp. 309 (N.D. Ga. 1971), at p. 312, the court stated: "As contended by defendants, plaintiff, as subrogee, is limited to indemnification only. 83 C.J.S. Subrogation § 14, p. 614. The general rule in this country is that a subrogee is entitled to indemnity to the extent only of the money actually paid by him to discharge the obligation — the surety bond in this case — or, the value of the property applied for that purpose. 50 Am. Jur., Subrogation § 119, p. 760. To the same extent, see 83 C.J.S. Subrogation § 52, p. 681. It was held in *Cook v. Crow*, 194 So. 455 (La. App. 1939), that '[t]he contract of suretyship is essentially a beneficient one and whilst the surety who paid was legally subrogated, he was so only to the extent of his actual and necessary payment . . . [i]ndemnification and not profit is the measure of the surety's recourse against the principal. . . .' Referring to 50 Am. Jur. 760 § 119, the Court in *Milan v. Kausch*, 194 F2d 263 (6th Cir. 1952), stated, 'It is the general rule in subrogation that the subrogee is to be reimbursed only to the extent of the amounts paid in discharge of the obligation assumed by the subrogee.' Although there is no authority apparent to the Court that a subrogee under the law of Georgia is limited to indemnification, this Court concludes that to be the law and does so find. The Court further finds that punitive damages are not assignable as a property right under Georgia Code § 85-1805 [OCGA § 44-12-24]."

While we believe that the reasoning of the federal court is logical

and worthy of acceptance, we can base our decision on equally solid ground. As Rankin was dismissed because he was not the real party in interest in relation to the subrogated payments, we likewise conclude that neither Empire nor Malone is the real party in interest in order to seek and recover either exemplary damages or attorney fees. Those damages are recoverable only by the party who has suffered a tortious loss of property from an act by Southern. The railroad has harmed Empire and Malone only vicariously. It is not their property that suffered damage. As OCGA § 44-12-24 provides, a right of action for a personal tort to an assignor may not be assigned. This is not to say that Empire and Malone could not recover in their own name and interest the monies paid by them to reimburse Rankin and Purex for the alleged tortious act of Southern. See *Hubbard v. Ruff*, 97 Ga. App. 251 (103 SE2d 134). But as we read the language of OCGA §§ 46-1-2 (c) and 46-2-90, these statutes create personal liability for tortious injury to persons and property and where that conduct is wilful, those damages may include exemplary damages and attorney fees. Inasmuch as neither Empire nor Malone had any of their own property damaged, wilfully or otherwise, there is no right in either of them to recover damages other than compensatory damages automatically assigned to them as subrogees. *Maryland Cas. Co. v. Brown*, 321 FSupp. 309, supra. Thus, we conclude the trial court erred in charging upon principles of exemplary damages as authorized under OCGA § 46-1-2 (c) and attorney fees as authorized by OCGA § 46-2-90.

2. Southern alleges in its sixth enumeration of error the trial court erred in refusing Southern the right to call an expert witness to testify that the train could not have been traveling at a speed approximating 50-60 mph. Depositions were taken in this case over a year before trial. Some of these depositions indicated eyewitness opinions that because they were driving 35-40 mph in a northerly direction on Route 41 and the train passed them, it was the deponent's opinion that the train was proceeding in excess of 50 mph. Counsel for Southern expressed surprise at the testimony of these witnesses and desired to produce during the trial the testimony of a previously undisclosed in-house expert witness (i.e., an employee of Southern) that the train was not and could not have been proceeding so fast.

Contrary to claims by Southern's counsel of surprise, it was shown that several months before trial, Southern was informed that at least four witnesses would be called who would place the speed of the train at 50-60 mph. Moreover, it was not disputed that Southern had deposed its own witness who stated that the train may have been going 50-60 mph. Thus, surprise furnishes a most tenuous basis for a delay in the trial in order to allow plaintiffs to procure their own expert in rebuttal. A continuance or delay as suggested by Southern flowing from the allowance of their undisclosed witness lies within the

sound discretion of the trial court. To be considered, in the exercise of that discretion by the trial court, is the obvious lack of surprise as to the speed evidence, the fact that the trial had progressed far into its development, that there were out-of-state witnesses who had come for trial at considerable sacrifice and expense, and the possibility that because Southern had misconceived the impact of the speed testimony, it wished belatedly to change its trial tactics. See *Phillips v. Hopper*, 237 Ga. 68, 71 (227 SE2d 1); *Stanley v. Amos*, 79 Ga. App. 297 (53 SE2d 568). On the basis of this evidence, the trial court ruled that there was no support for a claim of surprise and the calling of such an expert at so late a date would amount to trial by ambush and declined to allow the witness to be called. Southern was allowed to and did present evidence by two persons present on the train that because the train proceeded from point A to point B in a certain amount of time, it was not possible for the train to have accelerated to such a speed and further both testified they looked at and were certain that the speedometer on the train reflected that before and at the time of the impact the train was proceeding at a steady rate of 20 mph.

Though the rebuttal evidence of the expert may have been relevant and material, we also recognize the trial court's dilemma. The witnesses were present, the trial was already in progress, and defendant had had over a year to prepare its case. While one course of action may have been to grant time for plaintiffs to interview the witness and even grant a continuance to prepare contradictory expert evidence, this had to be weighed against the lack of diligence by Southern and the impact this would have on the orderly progress of the trial and the parties involved. We cannot fault the trial court in its exercise of discretion under the circumstances. Moreover, at best the expert could only have given opinion evidence as to the approximate speed. In fact Southern presented positive evidence that the train's speed was exactly 20 mph. Thus in addition to what we consider to be a reasonable exercise of discretion in the exclusion of this evidence, we also find that the evidence would be at best cumulative of evidence already admitted. Under such circumstances, we find no abuse of discretion in the refusal of the belatedly proffered expert. See *Smith's Transfer Corp. v. Alterman Foods*, 162 Ga. App. 284, 286 (2) (291 SE2d 261).

3. In enumeration of error 7, Southern complains that the trial court erred in denying directed verdict as to Malone's recovery of compensatory damages for the value of the damaged detergent in that Malone allegedly did not establish by competent evidence the fair market value of the soap at the point of delivery.

In a suit for damages to personal property, the measure of damages is the market value of the property before and after the damage to such property. *Molly Pitcher Canning Co. v. Central of Ga. R. Co.*,

149 Ga. App. 5, 15 (253 SE2d 392). This standard was the subject of an appropriate charge without objection. The evidence adduced by Malone showed that Purex purchased 1,300 cases of soap at a specified cost. The purchasing agent testified this price was below market value and represented wholesale value based upon a volume sale. Southern stipulated that the wholesale price was a reasonable price. After negotiation with Purex, Malone paid Purex a slightly higher price per case but that price was stated still to be below actual fair market value. There was no objection to the testimony of this purchasing agent for Purex who demonstrated expertise in the area of the given testimony. Thus we will conclude that cost price (to Purex) when coupled with other evidence offered by the witness (i.e., that the agent was involved in the customary practice of purchasing for Purex and that the price paid was below market value) was admissible to form a basis upon which the jury could return a reasoned verdict as to value. *Burson v. Copeland*, 160 Ga. App. 481, 483 (287 SE2d 386). However for the reasons stated in Division 1 of this opinion, the award of $461 as clean up costs could only be allocated to Purex in the clean up of its property and was at best a cost voluntarily assumed by Malone in servicing its subrogated shipper but not paid by Malone to Purex. Thus the verdict to Malone improperly includes $461 as compensatory damages.

4. The remaining enumerations of error assigned by Southern are of such a nature that in the event of a retrial, we are satisfied that they will not occur at such new trial. Therefore we find no necessity to address those enumerations.

5. In consideration of the above discussions and holdings of this decision, we reverse the award of exemplary damages (including the sum of $461 to Malone improperly included as compensatory damages) and the award of attorney fees as to both Empire and Malone, but affirm the award of compensatory damages to both Empire and Malone provided the trial court on remittitur writes off that portion of the verdict granting exemplary damages and attorney fees, otherwise reversed.

*Judgment affirmed in part, reversed in part, and case remanded with direction. Banke, C. J., Deen, P. J., McMurray, P. J., Sognier, Pope, and Benham, JJ., concur. Carley, J., dissents as to Division 2. Beasley, J., dissents in part.*

CARLEY, Judge, dissenting.

I respectfully dissent to Division 2 of the majority opinion wherein it is held that the trial court did not commit reversible error in refusing to allow Southern to present an expert witness who would give his opinion that it was physically impossible for the train to be proceeding as fast as some witnesses testified. The trial court refused

to allow the expert to testify because the name of the expert had not been furnished to the opposite party in answers to interrogatories. Also the trial court placed great emphasis upon the fact that "speed" had been an issue for over a year as a result of discovery and that, therefore, "defendant had over a year to prepare its case." However, the mere fact that "speed" was in issue does not give the trial court or this court the unbridled right to dictate how a litigant's attorney will attempt to convince the jury of the correctness of his position. Especially is this relevant in this case since one of the witnesses who testified that the train was exceeding 50 miles per hour had previously told the defendant that he did not know anything about the accident. Another witness who estimated speed at between 50 and 60 miles per hour was standing outside a restaurant only 100 yards from the crossing.

It is to be noted that after the first day's testimony, wherein the 50 to 60 miles per hour speed estimates were given, defendant's attorney informed the court and counsel for the other side that he intended to introduce, during his part of the case, the opinion of the expert, Mr. Wolfe. Defendant's counsel stated: "I want to make this known to [plaintiff's counsel] before he closes his evidence. I'm perfectly willing to bring him in, let him depose him, interview him or whatever. I did not consult this [expert] until yesterday, as a result of the testimony I heard yesterday." Mr. Wolfe, the expert, was present at the courthouse throughout the day and available for interview or deposition.

"The testimony of [this witness] was relevant and admissible . . . . [T]he proper procedure when [he was] called to testify was not to object to [his testifying] or to the admission of [his testimony], but to move for a postponement of the trial for a sufficient length of time to enable the [plaintiff] to interview [him], check the facts to which [he] would testify, and, if indicated, arrange to secure rebuttal evidence or to impeach [him]. It would be an abuse of discretion, requiring the grant of a new trial, to refuse the postponement. If this should not come up until the trial was already under way and the court determined that a postponement was impracticable, a mistrial should be declared. [Cits.] Another remedy for failure to answer, refusal to answer or the concealment of information, is a citation for contempt." *Nathan v. Duncan*, 113 Ga. App. 630, 641 (149 SE2d 383) (1966). *Nathan* makes it clear that the failure of the party to timely answer interrogatories or to furnish other information may be dealt with in various ways, but one of the methods available is *not* exclusion of relevant pertinent testimony. See also *Glover v. Southern Bell Tel. &c. Co.,* 132 Ga. App. 74, 77 (207 SE2d 584) (1974); *Redwing Carriers v. Knight,* 143 Ga. App. 668, 673 (239 SE2d 686) (1977); *Intl. Assn. of Bridge &c. Local 387 v. Moore,* 149 Ga. App. 431, 436 (254 SE2d 438)

(1979).

The majority rationalizes the error of the trial court by stating that "[a]t best the expert could only have given opinion evidence as to the approximate speed." How can the trial court or this court say that such expert opinion evidence would not have been enough to sway the jury to the other side of the issue? It is recognized that one of the purposes of the Civil Practice Act was to do away with "trial by ambush" as mentioned by the trial court and the majority. However, "[t]he object of all legal investigation is the discovery of truth." OCGA § 24-1-2. That objective cannot be realized if, as will be the effect of the majority opinion, courts look upon a trial as a pre-planned script which is chiseled in stone and which precludes the utilization of on-the-scene tactical decisions by lawyers designed to produce to the trior of fact testimony or other evidence which will assist in the performance of their task as advocates in our adversary system. Especially is that true here where defendant's counsel sought to give the jury an opinion of an expert that it was physically impossible for the train to be going as fast as two lay witnesses had testified. I believe that the trial court abused its discretion and that a new trial should be granted.

BEASLEY, Judge, dissenting in part.

1. I respectfully dissent with respect to Division 1 and would find no error in charging on exemplary damages and attorney fees.

OCGA § 44-12-24 provides that, except for situations not involved here, "a right of action is assignable if it involves, directly or indirectly, a right of property. A right of action for personal torts or for injuries arising from fraud to the assignor may not be assigned."

The claims pursued by Empire and Malone involve rights of property, not rights arising out of personal torts such as bodily injury or defamation or injuries from fraud. The trailer insured by the one and the detergent contracted to be delivered by the other were, to be sure, property belonging to others. But by their contractual obligations involving the safekeeping of the trailer, on the one hand, and the delivery of the detergent, on the other hand, both became liable to the owners when the property was damaged. Rankin's right to recover from the tortfeasor for damage to his property was a right to be fully compensated not only for the loss in value of the trailer but also the natural and probable consequences of the injury to the trailer flowing from defendant's tortious conduct, that is, the towing charges after the collision. Purex' right to recover was the same and included not only the loss in value of its detergent but also what it cost to clean up the mess and collect what could be salvaged. Those expenses were occasioned by the tort, and being rights of property, were assignable to the parties who were contractually bound to pay them to the

direct victims. "Assign" in this Code section "means 'transfer' so as to vest title in the recipient and allow such person to sue directly." *McLanahan v. Keith*, 135 Ga. App. 117, 119 (217 SE2d 420) (1975). I see no impediments to the assignment of the entire choses in action here. Even defendant recognized as much, in insisting that Empire rather than Rankin was the real party in interest as it related to the losses arising out of the smashing of the trailer by the defendant's train.

The action was brought pursuant to OCGA § 46-1-2. As stated by the majority, it provides in subsection (c) that "anyone whose person or property has been injured by such railroad . . . [may sue] for the purpose of recovering damages for such injuries . . . ." Subsection (b) specifies the damages that may be recovered in actions against railroad companies for recovery of damages for any wrong or injury inflicted by such companies: "the damages which may be recovered in such actions shall be the same as in actions between individuals . . ." plus exemplary damages for wilful violation of law.

The expression "injury to property" is used "in its broad and general sense." *Lamb v. Howard*, 145 Ga. 847, 850 (90 SE 63) (1916). In *Lamb*, the court said it was broad enough to comprehend a wrongful conversion of property. See also *Crawford v. Crawford*, 134 Ga. 114, 120-121 (67 SE 673) (1909). Since both Empire and Malone suffered a loss of their property (funds), albeit indirectly but nevertheless inescapably, as a result of the tortfeasor's wrongful acts, they should be entitled to all of the damages allowed by subsection (b). If they cannot recover for the towing and clean up, nor the subsection (b)'s exemplary damages upon what, then, is bottomed their right to action for the loss of value of the trailer and the detergent? If it arises under OCGA § 46-1-2 (c), then all damages permitted should be recoverable.

OCGA § 46-2-90 also renders the railroad liable for its unlawful acts and omissions in violation of a statutory enactment or order of the Public Service Commission "to the persons affected thereby for all loss, damage, or injury caused thereby or resulting therefrom." The losses incurred by Empire and Malone as the ultimate parties who had to bear the results of the railroad's unlawfulness would thus be included. And if the proof is that the act or failure to act was willful, the jury would be authorized to fix a reasonable attorney fee under this Code section.

The exemplary damages provision is aimed at the defendant and is an effort to affect its future behavior; it is not focused on the plaintiff or awarded as compensation to it. Thus the fact that the plaintiffs were the insurer and the primary contractor should be irrelevant to whether this item of damages should be awardable.

Moreover Southern should not be permitted to avoid exposure to exemplary damages and attorney fees by insisting on the substitution

of Empire for Malone; if the majority's reasoning is followed, the court below erred in dismissing Rankin, who would have retained the right to these additional damages. And by the same token, Purex should have been brought in as an essential plaintiff.

2. With regard to Division 2, while I agree with the philosophy expressed by the dissent, I cannot conclude that the trial court's refusal to allow the expert to testify amounted to an abuse of discretion which requires a new trial.

DECIDED MARCH 12, 1985 —
REHEARING DENIED MARCH 29, 1985 — ▮▮▮▮▮▮▮▮▮▮

*Eileen M. Crowley, Lianne M. White*, for appellant.
*H. Sanders Carter, Jr.*, for appellees.